United States District Court
Southern District of Texas
**ENTERED**
July 29, 2016
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **LAURA MIRELES,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. B: 13-197** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| **& DANIEL RIANO,** | § | |
| **Defendants.** | § | |

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On October 21, 2013, Plaintiff Laura Mireles ("Mireles") filed a complaint against the United States, and Customs & Border Protection Officer Daniel Riano ("Riano"). Dkt. No. 1. Mireles's claims relate to her alleged mistreatment by Riano during a search of her vehicle at or near one of the international bridges in Brownsville, Texas. The United States has since been dismissed as a defendant in this case. Dkt. No. 42.

On September 29, 2015, Riano filed a motion for summary judgment, asserting that his actions are protected by qualified immunity and, thus, summary judgment is required. Dkt. No. 73. On November 12, 2015, Mireles timely filed a response. Dkt. No. 81. On December 3, 2015, Riano filed a reply brief. Dkt. No. 85.

After reviewing the record and the relevant case law, it is recommended that the motion for summary judgment be denied. Viewing the facts in the light most favorable to Mireles, as the Court must do at this point, Riano is not entitled to qualified immunity for his actions.

### I. Background

In some ways, this case resembles a classic "she said, he said" dispute. Despite the

availability of camera coverage, none of it is apparently recorded.[1]  For that reason, the Court is left with varying eyewitness accounts of what occurred.  Unsurprisingly, the account given by Mireles diverges dramatically from the accounts given by the Customs & Border Protection officers, who were present that day.  It is not the Court's task, nor its intent – at this stage of the proceedings – to untangle these accounts.  Rather, the Court must view "the summary judgment evidence in the light most favorable" to the non-movant, who is Mireles. Freeman v. Gore, 483 F.3d 404, 410 (5th Cir. 2007).  Accordingly, the Court's recitation of the factual background is set forth employing that mandate.  At trial, in arriving at its decision, the fact-finder may consider and weigh the facts differently, but those proceedings operate under a different evidentiary standard. See Gossett v. Du-Ra-Kel Corp., 569 F.2d 869, 871 (5th Cir. 1978) (a summary judgment motion "is not a substitute for trial").

### A. Factual Background

On November 5, 2012, Mireles – a United States citizen – was working as the assistant manager at the Brady's duty free store in Brownsville, Texas. Dkt. No. 81, pp. 102-103.  Mireles was working from 3 p.m. until close that day; the store closed at 8 p.m. Id., p. 104.  At around 7:30 p.m., Mireles realized that she had forgotten her set of keys necessary to lock the store when it closed. Id., p. 104.

Mireles contacted a co-worker, who possessed duplicate keys for the store; the co-worker was in Mexico at the time. Dkt. No. 81, pp. 104-105.  Mireles left the store and met the co-worker on the Mexican side of the international bridge. Id., pp. 107-108.  After retrieving the keys, Mireles drove back into the United States. Id

Upon returning to the United States, Mireles entered the SENTRI lane. Dkt. No. 81, pp. 109-110. The SENTRI program requires applicants to "undergo a thorough biographical

---

[1] The Court notes that in response to requests for production propounded by Mireles, Riano stated that the area has a "real time" video feed, but the system "is not recorded on a DVR or other recording devices." Dkt. No. 81, p. 672.  Essentially, cameras are present to allow CBP officers to view what is going on in other areas of the port/bridge area, but that footage is not archived.

background check against criminal, law enforcement, customs, immigration and terrorist indices; a 10-fingerprint law enforcement check; and a personal interview with a CBP officer."[2]  At the SENTRI lane, she encountered Officer Rendon, who asked her if she had any items to declare for customs purposes. Id., p. 110.  Mireles replied that she did not; after completing his inspection, Officer Rendon permitted Mireles to re-enter the United States. Id., p. 110.  At that point, Mireles asked Rendon if she could use the "turnaround lane," so she could immediately return to Brady's. Id., p. 110.  Rendon authorized Mireles to use the turnaround lane. Id., p. 110-111.  This was the first time that Rendon had personally authorized Mireles to use the turnaround lane. Id., p. 111.  Mireles stated that when Rendon gave her permission, she did not see him activate his radio or tell any other officers that he was authorizing Mireles to use the turnaround. Id., p. 136.

Using the turnaround lane allowed Mireles to return to Brady's without going through secondary inspection. Dkt. No. 81, p. 333.  Mireles does not remember exactly how fast she drove through the turnaround lane, but testified at her deposition that it is "very difficult to drive at a fast speed through this area . . . [because] there are speed bumps, and there's also like cement walls, and it's also – and it's common for there to be more cars there stopped." Dkt. No. 81, p. 119.

After using the turnaround lane, Mireles returned to Brady's and completed the process of closing the store for the night. Dkt. No. 81, pp. 123-124.  Mireles estimated that this process took "about five or 10 minutes." Id., p. 132.  Mireles activated the alarm; she and a co-worker, Nadia Diaz, then left Brady's. Id.

As Mireles and Diaz entered their respective vehicles, they were approached by a Customs and Border Protection patrol car with its emergency lights on. Dkt. No. 81, p. 133.  Mireles rolled down her window as Officer Riano approached her Jeep. Id., p. 134.  At that time, Officer Riano asked her where she had come from. Id.  Mireles replied, "from Mexico." Id.

---

[2] This language is a direct quote from the Customs & Border Protection website describing SENTRI. See https://goo.gl/H91jaQ (last accessed July 29, 2016).

Riano asked Mireles why she had avoided the x-rays; she replied by asking him, "what x-rays?" and asked him to explain what he meant. Dkt. No. 81, p. 135. Riano replied "the second inspection, the x-rays." Id. Mireles responded that she "had not avoided the inspection, that [she] had only asked the officer if [she] could use the return lane, the turnaround." Id.

Riano asked Mireles if she had permission to use the return lane; she replied that she did. Dkt. No. 81, p. 137. Mireles testified that Riano was not angry during this exchange, but was "just trying to get some answers." Id., p. 137. Mireles testified that these exchanges took place in Spanish. Id., p. 138.

Riano then spoke in English into his shoulder radio. Dkt. No. 81, p. 138. Mireles did not understand all of what Riano said, but she did hear her name. Id., p. 138. Riano then turned to Mireles and said that they were going to inspect the vehicles driven by Mireles and her co-worker. Dkt. No. 81, pp. 140-141. Riano testified that, prior to his search of Mireles's vehicle, another CBP officer informed him – that is Riano – that Mireles had permission to use the return lane. Id., p. 242-43.

At that point, Mireles exited her vehicle, leaving the driver's side door open. Dkt. No. 81, p. 142. Mireles stepped away from the vehicle as Riano began inspecting the vehicle. Id., p. 143. At all times during Riano's inspection of Mireles's car, she remained standing on the driver's side of the vehicle. Id., p. 149. Riano began his search by inspecting the area surrounding the drivers' seat. Id, p. 143. He stated that he "searched the drivers side of the vehicle first looking for possible contraband or weapons and moved around the car to search the passenger side of the vehicle when he noticed a purse." Id, p. 661.

Mireles's purse was on the front passenger seat of her vehicle; when Riano opened the front passenger door, he began to inspect the purse. Dkt. No. 81, p. 148. At that moment, Mireles "just moved a few steps forward to be able to see what Officer Riano was doing." Id., p. 148. Mireles moved close enough to the vehicle that, by her own admission, she could have reached into the inside of the car from where she was standing. Id., p. 151. At her

4

deposition, she admitted that she was close enough that she "would have access to the side pocket" on the open driver's side door of the Jeep. Id. Riano stated that Mireles "was close enough to where I could see her lit up by the dome light in the car," but that he did not remember her ever entering the vehicle. Id., p. 245.

Diaz, Mireles's co-worker, stated that Mireles got "close and she asked [Riano] if he is checking her purse" and Riano "yell[ed] for her to get back, to go back." Dkt. No. 81, p. 221. Diaz further stated that Mireles replied, "I'm just asking if you're going to inspect my purse," and that she "wanted to be present" when Riano inspected her purse. Id.

When Riano saw Mireles move closer, he told her in Spanish to "go over there." Dkt. No. 81, p. 152.[3] Mireles described Riano as "yelling" at her. Id., p. 152. Mireles did not move away, but responded that she "wanted to see [her] purse." Id., p. 152. Mireles stated that she "did not threaten Riano or act aggressively or raise [her] voice." Id., p. 45. Riano admitted in his deposition that he was unaware of any CBP policy that "prohibit[ed] people from watching the search of their personal property." Id., p. 245-46. Riano also admitted that he did not "remember [Mireles] reaching for anything." Id., p. 248.

Riano responded by raising his voice and again saying "get over there." Dkt. No. 81, pp. 152-153. Mireles, again, did not move and responded by telling Riano that she wanted to see her purse. Id., pp. 152-153.

At that point, Riano walked from the front passenger door of Mireles's vehicle, going around the front of the vehicle, and advanced toward Mireles. Dkt. No. 81, pp. 154-155. When Mireles saw Riano advancing towards her, she "moved back a few steps and [she] told him not to yell at [her]." Id., p. 155. Riano continued to advance towards her. Id., p. 155. Riano "did not say anything or explain his actions." Id., p. 46. Riano admitted that he did not warn Mireles that he was going to take physical action against her. Id., p. 257.

The Court notes that Riano has stated that he is 5 feet, 10 inches tall and that he said

---

[3] Mireles testified that the exact phrase used by Riano was "haste para ya." Dkt. No. 81, p. 152.

Mireles's height was roughly up to his shoulder and that she was "smaller" than he was. Dkt. No. 81, p. 244.  Riano also stated that at the time of the incident, he weighed 250 pounds and that he estimated Mireles's weight to be between 100 and 125 pounds. Id., pp. 244, 256.

Diaz testified, at her deposition, that she saw Riano "come around in front of the truck yelling for her to move back; and that Mireles responded, "I was just asking. Don't yell." Dkt. No. 81, p. 221.

Mireles stated that Riano "touched her hands," which were in front of her body, near her waist. Dkt. No. 81, p. 155-56.  Mireles continued to retreat and "pulled [her] hands back and told [Riano] not to touch [her]." Id., p. 156.  Riano held her by putting his hands on her, right above her wrists. Id., p. 161.  Diaz stated that she saw Riano try to "get [Mireles] by the hand and [Mireles] pulls her hand away and tells him not to touch her, that she was just asking." Id., p. 221.

Mireles testified that Riano "made several movements and in a matter of seconds [she, Mireles] was on the ground." Dkt. No. 81, p. 162.  Mireles described the movements, stating that she remembered that Riano "got a hold of me by my arms . . . he put his feet over my feet or on my feet . . . and he made this movement to throw me to the floor." Id., p. 162.  She elaborated that Riano tried to "sweep" her feet out from under her. Id., p. 163.  Mireles ended up "face up" on the ground, but Riano then turned her over so that she was "face down." Id., pp. 163-64.

Diaz testified that she saw Riano "get[] a hold of [Mireles's] hand or her wrist again, her arm and moves her back.  And then on the ground, because he knocked her back and he goes over with her." Dkt. No. 81, p. 221.

Once Mireles was face down, Riano handcuffed her hands behind her back. Dkt. No. 81, p. 166.  CBP officer Chris Canaba came over and got "a hold of [Mireles] by [her] heels" while Riano was handcuffing her. Id., p. 169.  Riano then put his "weight" on to her back; Mireles testified that she thought he had his knee on her back. Id., pp. 166-67.  Diaz testified that Riano, indeed, had "his knee on" Mireles. Id., p. 221.

Mireles testified that "in this process of this man throwing me to the ground and putting my hands up to my back, I kept yelling and I asked him to let me go. And I repeated that on many occasions." Dkt. No. 81, p. 168. Mireles testified that Riano, in Spanish, "told [her] to be quiet or he was going to hit me." Id., p. 171. Mireles stated that Riano ended that sentence with an English word that she was unfamiliar with, but now recognized as the word "taser." Id., pp. 171-72. Riano "yell[ed]" the threat to use the taser at Mireles twice. Id., p. 175. Riano admitted that he threatened to use the taser on Mireles. Id., p. 250.

Diaz testified that while Riano was handcuffing Mireles, "[t]hat's when he yells at her to shut up, to be quiet. She tells him that she's not going to shut up, for him to tell her what is happening. And that's when he tells her again to shut up or he's going to hit her with the case[4] and she remains there silent." Dkt. No. 81, p. 223.

Mireles testified that "when Officer Riano finished putting the handcuffs on me, Officer Riano withdrew, left me, and Officer Canaba got me by the arms and put me in a seated position on the ground." Dkt. No. 81, p. 176. Canaba told Mireles "not to fight," and then placed her in the back seat of a CBP patrol car. Id., pp. 176-77. Once Mireles was in the back seat, Canaba sat in the driver's seat. Id., p. 178.

At some point, Riano came over to tell Mireles that they were going to tow her vehicle because they needed to move it and could not start it. Dkt. No. 81, pp. 179-80. Mireles informed him that there was a kill switch that needed to be flipped to start it. Id. Mireles was not able to help Riano turn the vehicle on "because the doors of the patrol car were closed and [Mireles] was inside the patrol car." Id, p. 206. Mireles's co-worker, Diaz, informed Riano about how to operate the vehicle. Id., pp. 179-80.

After the vehicle was moved, a search was completed. Dkt. No. 81, p. 253. According to Riano, there were no weapons or drugs found in the vehicle or Mireles's purse. Id

---

[4] When asked if Diaz meant "tase," she replied, "I heard and that's the way I understood it as 'case.' " Dkt. No. 81, p. 221. The Court notes that Diaz gave her deposition in Spanish. Id., pp. 217-18.

Mireles informed Canaba that she "was hurt, that Officer Riano hurt [her]." Dkt. No. 81, p. 179. Canaba asked Mireles if she needed medical attention and she informed him that she did. Id. Canaba then transported Mireles to another location, near the Administrative Building. Id., p. 184.

Mireles testified that "some moments later," the paramedics arrived. Dkt. No. 81, p. 184. When the paramedics arrived, an unidentified port officer came over to release Mireles from the handcuffs. Id., p. 185. The officer was able to release Mireles from the right handcuff, but the key failed to unlock the handcuff on her left hand. Id., pp. 185-186. Thus, Mireles was able to freely move her hands to the front of her body, but the handcuffs were still attached to one wrist. Id. The fire department was called and cut the left handcuff off of Mireles's wrist. Id., pp. 189-90. At this point, Mireles was still sitting in the rear seat of the CBP patrol car.

In a written statement given to CBP officials, Riano estimated that 10 minutes elapsed between the time that he handcuffed Mireles and the time that ambulance arrived, at which point the paramedics "asked for handcuffs to be removed." Dkt. No. 81, p. 1028.

During the time while the parties waited for the fire department to arrive, the paramedics "proceeded to examine" Mireles. Dkt. No. 81, p. 186. Mireles testified that during this time, no one "said that [she] could leave" and no one told her she was "under arrest."[5] Id., p. 189. At some point, before the fire department arrived, Mireles was given her purse and was allowed to use her cell phone to call her sister. Id., p. 49. Her sister "had been waiting in the parking lot in secondary near the CBP administrative office to see me, but she said they had not allowed her to come see" Mireles. Id., pp. 48-49.

---

[5] The Court notes that this testimony is disputed by CBP officer Cynthia G. Gutierrez, who testified that a CBP official informed Mireles that she was "free to leave as soon as we have – get the handcuff off." Dkt. No. 81, p. 373. Gutierrez said she translated that statement into Spanish and informed Mireles. Id. At this stage of the proceedings, the Court must view the evidence in the light most favorable to the plaintiff. Freeman, 483 F.3d at 410. Even if Gutierrez's statement was considered, it merely creates an evidentiary conflict, which establishes a material dispute of fact. Bosque v. Starr Cty., Tex., 630 F. App'x 300, 305, n. 6 (5th Cir. 2015).

Mireles remained in the back of the patrol car because, when she tried to stand up, she "had a lot of pain in [her] right foot and . . . could not walk." Dkt. No. 81, p. 190. Mireles's sister had arrived, but was unable to come over and talk to Mireles "because it was not permitted at that time." Id., p. 191. An officer came over to Mireles "to try and get [her] to come out of the patrol car for me to go to the office that was across from the patrol car." Id., p. 190. Mireles stated that it was "impossible" for her to walk, so she "sat back down" in the patrol car, remaining there for "several minutes." Id., pp. 190-91.

After the fire department cut off the handcuff, and while Mireles was still in the patrol car, CBP Chief Supervisor Chris Kishore came to Mireles and informed her that she could leave. Dkt. No. 81, p. 191. At that point, Mireles was placed on a gurney and taken to the hospital by ambulance. Id. According to Mireles, because she did not have health insurance, she chose not to be admitted to the hospital or examined by any medical personnel there. Id., pp. 191-192.

Mireles estimates that she sat in the back seat of the patrol for about an hour – the time from when Canaba parked the patrol car near the administrative building until she was placed in the ambulance. Dkt. No. 81, p. 48. Gutierrez testified that she went over to be near Mireles when she saw the ambulance arrive and that it took "at least 45 minutes to an hour" for the handcuffs to be removed. Id., p. 372.

Mireles was not charged with any crime. Dkt. No. 81, p. 359.

In support of her claimed injuries, Mireles has submitted photos, showing various injuries to her left wrist, her right forearm, her knees, her left elbow and her right foot, among others. Dkt. No. 81, pp. 52-68. Riano stated that he suffered no injuries as a result of the encounter. Id., p. 248.

### B. Procedural History

On October 21, 2013, Mireles filed a complaint against the United States and Riano. Dkt. No. 1. As relevant here, Mireles asserted claims of false arrest and excessive force against Riano, pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971). Id., p. 10.

9

On January 27, 2014, the United States and Riano timely filed an answer. Dkt. No. 12. In his answer, Riano asserted that he was entitled to qualified immunity. Id., p. 14.

On July 7, 2014, the United States and Riano filed a motion to dismiss. Dkt. No. 22. The United States sought dismissal pursuant to FED. R. CIV. P. 12(b)(1), stating that the Court lacked jurisdiction because the Government had not waived sovereign immunity for Mireles's claims. Id. In that same motion, Riano sought dismissal pursuant to FED. R. CIV. P. 12(b)(6), asserting that Mireles had not pled facts that would overcome his invocation of qualified immunity. Id. Because Riano had already filed an answer, his 12(b)(6) motion was technically untimely. For that reason, the Court considered Riano's motion to be one pursuant to FED. R. CIV. P. 12(c). Dkt. No. 38, p. 6, n. 5 (citing Great Plains Trust Co. v. Morgan Stanley Dean Witter, 313 F.3d 305, 313 n. 8 (5th Cir. 2002)).

On September 11, 2014, the undersigned issued a report and recommendation, which recommended that the claims against the United States be dismissed and that the claims against Riano proceed, finding that he was not entitled to qualified immunity. Dkt. No. 38. On November 10, 2014, the District Judge adopted the report and recommendation in full. Dkt. No. 42. Thus, the only claims that survived were Mireles's claims that Riano unlawfully arrested her and used excessive force against her.

On December 17, 2014, the parties filed an amended discovery and case management plan, where they agreed to limit discovery to the issues surrounding whether qualified immunity is appropriate. Dkt. No. 46. The parties agreed that if the Court denied Riano's motion for summary judgment, then "the parties will conduct further discovery on all remaining matters to be tried, such as the scope of Plaintiff's damages." Id.

On September 29, 2015, Riano filed a motion for summary judgment, asserting that he is entitled to qualified immunity.[6] Dkt. No. 73. Riano asserts that he never arrested Mireles, but merely "detain[ed] and handcuff[ed] Plaintiff as a result of her physical

---

[6] The Court notes that Riano's sole basis for summary judgment is his claim of qualified immunity. Indeed, it is the only question raised by the parties in the current motion.

interference with a customs search." Id., p. 16.  Riano also asserts that he "did not use excessive force in restraining and detaining Plaintiff." Id., p. 17.

On November 12, 2015, Mireles timely filed a response to the motion for summary judgment. Dkt. No. 81.  Mireles asserts that Riano is not entitled to qualified immunity on the unlawful arrest claim, because Riano lacked probable cause and a reasonable person would not feel free to leave under the circumstances presented by the facts of this case. Mireles also asserts that Riano is not entitled to qualified immunity on the excessive force claim, because – given the alleged facts of this case – the force used was excessive.

On December 3, 2015, Riano filed a reply brief. Dkt. No. 85.  In that reply, he reiterated his invocation of qualified immunity. Id.

## II. Applicable Law

### A. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  A genuine issue is "real and substantial, as opposed to merely formal, pretended, or a sham." Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001).  A material fact is one that might influence the outcome of the suit. Id.  Accordingly, a "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

The Court must review all evidence in the light most favorable to the non-moving party. Piazza's Seafood World, 448 F.3d at 752.  Factual controversies are resolved in favor of the non-moving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Murungi v. Xavier Univ. of La., 313 Fed. App'x 686, 688 (5th Cir. 2008) (unpubl.) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).  "[I]n the absence of proof," the court cannot "assume that the

nonmoving party could or would prove the necessary facts." Little, 37 F. 3d at 1075.  Finally, "a court should not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." Chacon v. Copeland, 577 Fed. App'x 355, 360 (5th Cir. 2014) (unpubl.) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)) (internal quotations omitted).

### B. Qualified Immunity

Qualified immunity protects "government officials performing discretionary functions" from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Qualified immunity is "a defense against an individual capacity lawsuit." Sanders-Burns v. City Of Plano, 594 F.3d 366, 378 (5th Cir. 2010).  "Qualified immunity gives government officials breathing room to make reasonable, but mistaken judgments." Thompson v. Mercer, 726 F.3d 433, 437 (5th Cir. 2014) (internal citation omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"At summary judgment, it is the plaintiff's burden to rebut a claim of qualified immunity once the defendant has properly raised it in good faith." Cole v. Carson, 802 F.3d 752, 757 (5th Cir. 2015).  "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Cass v. City of Abilene, 814 F.3d 721, 728 (5th Cir. 2016) (internal quotations omitted).

The plaintiff's burden has been described as a "demanding" one. Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015).  The plaintiff must establish:  (1) that the defendant's actions violated the plaintiff's constitutional rights; and (2) that those rights were clearly established at the time of the defendant's actions. Pearson v. Callahan, 555 U.S. 223

(2009). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.' " Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009).

In deciding a motion for summary judgment based on the invocation of qualified immunity, the Court must engage in two separate inquiries: (1) "whether a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law," and (2) "whether a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." Cantrell v. City of Murphy, 666 F.3d 911, 921 (5th Cir. 2012) (citing Wernecke v. Garcia, 591 F.3d 386, 391 (5th Cir. 2009)).

## III. Analysis

As previously noted, the instant motion for summary judgment revolves entirely around Riano's invocation of qualified immunity. As to each of Mireles's remaining claims – unlawful arrest and excessive force – the Court must consider (1) whether Riano violated Mireles's constitutional rights and (2) whether those rights were clearly established at the time of the incident. As to each of Mireles's claims – for the reasons set out below – Riano is not entitled to qualified immunity.

### A. Unlawful Seizure/Arrest Claim

Mireles has asserted that Riano's decision to handcuff her; place her in the patrol car; and make her wait; violated her right to be free of unreasonable seizure and arrest under the Fourth Amendment.[7] Riano seeks summary judgment, arguing that he is entitled to qualified immunity. In this posture, Mireles bears the burden of proving that Riano is not entitled to qualified immunity. Howell v. Town of Ball, No. 15-30552, 2016 WL 3595722, at *5 (5th Cir. July 1, 2016) ("Once a defendant properly invokes the defense of qualified immunity [on summary judgment], the plaintiff bears the burden of proving that the defendant is not

---

[7] The claim that Mireles was arrested without probable cause is substantively different than the claim that Riano used excessive force in effectuating that arrest. An excessive force claim is "separate and distinct" from a claim of unlawful arrest. Freeman, 483 F.3d at 417. As such, the Court must analyze each claim separately. Id.

13

entitled to the doctrine's protection.").  Mireles has submitted evidence that, if true, would overcome that immunity.

There is a constitutional right to be free from the unreasonable seizure or arrest of one's person.[8] <u>Brower v. County of Inyo</u>, 489 U.S. 593 (1989).  The standard for deciding the reasonableness of an arrest under the Fourth Amendment is identical in both civil and criminal cases.  <u>Wooley v. City of Baton Rouge</u>, 211 F.3d 913, 925 (5th Cir. 2000) (citing <u>Soldal v. Cook</u>, 506 U.S. 56 (1992)).  For that reason, the Court will cite criminal and civil cases interchangeably.

In deciding whether the arrest – <u>i.e.</u> the seizure of one's person – was unreasonable, and thus unlawful, the first question is whether Mireles was seized or arrested within the context of the Fourth Amendment.  The second question is, then, whether the seizure or arrest was unreasonable.  If the answers to both questions are affirmative, the focus changes.

If Mireles was subjected to an unreasonable seizure or arrest, the Court must then determine if the agent is nevertheless protected by qualified immunity.  That determination depends upon whether the seizure or arrest violated clearly established federal law when it was effected.  Each of these considerations is examined in turn.

### a. Seizure/Arrest

A person is considered "seized," within the meaning of the Fourth Amendment, if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." <u>U.S. v. Mendenhall</u>, 446 U.S. 544, 554 (1980).  "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." <u>U.S. v. Bengivenga</u>, 845 F.2d 593, 596 (5th Cir. 1988).

---

[8]  The standard for determining the reasonableness of the seizure or arrest of a person is different than the standard for determining the reasonableness of an agent's decision to detain a vehicle at the border for a search.  <u>See</u> <u>U.S. v. Guzman-Padilla</u>, 573 F.3d 865, 877-887 (9th Cir. 2009) (discussing searches and seizures in the border context).

The seizure must be the result of the use of force that was "intentionally" applied by the defendant. Brower, 489 U.S. at 599. Police detention is considered an "arrest" if a reasonable person, "in the suspect's position[,] would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest." Freeman v. Gore, 483 F.3d at 413. An "arrest" requires probable cause that a crime has occurred. Id.

A person, however, may be physically restrained by law enforcement without that custody being considered an arrest for constitutional purposes. "The police are allowed to stop and briefly detain persons for investigative purposes if the police have a reasonable suspicion supported by articulate facts that criminal activity 'may be afoot.' " U.S. v. Lewis, 208 Fed. App'x. 298, 300 (5th Cir. 2006) (unpubl.) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). This investigatory detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). If the investigatory detention lasts beyond that duration, it may turn into a de facto arrest. U.S. v. Zavala, 541 F.3d 562, 579 (5th Cir. 2008). "[E]very seizure having the essential attributes of a formal arrest[ ] is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

The line between an investigatory detention and an arrest – and determining which applies to the facts of any particular case – is not necessarily a straightforward task. Id. At the international border, authorities are permitted to hold a person long enough to complete their search without the detention becoming an arrest under the Fourth Amendment. Tabbaa v. Chertoff, 509 F.3d 89, 99-101 (2d. Cir. 2007) (detention of six hours at the border was not an arrest). In fact, "routine" searches and investigatory detentions may be lengthy in order to complete necessary actions, such as "vehicle searches, questioning, [and] identity verification . . ." Id.

In this case, Mireles was not merely detained and made to wait. Instead, she was tackled to the ground; was handcuffed and placed in the back of a CBP vehicle; and, was

then transported to the CBP office.  Under such circumstances, any reasonable person would consider their freedom to be restrained in a way "that the law typically associates with a formal arrest."  Freeman, 483 F.3d at 413.

In Freeman, the plaintiff was handcuffed, placed in the back of a police car and made to wait 30 to 45 minutes.  The Fifth Circuit found that a reasonable person "would surely believe that she had been restrained to an extent that normally accompanies a formal arrest." Id.  The same conclusion is inescapable in this case.  Riano clearly arrested Mireles within the meaning of the Fourth Amendment.  The limitations and acts imposed upon Mireles went beyond a brief investigatory detention and carried all of the formal hallmarks of arrest.

The Government has focused its analysis on Riano's authority to seize Mireles, a United States citizen, without reasonable suspicion or probable cause, simply because the acts occur at the border. Dkt. No. 85, p. 4.  This argument is misplaced and, if taken to its logical conclusion, troubling.

It is undoubtedly true that persons entering the United States have decreased Fourth Amendment rights.  "The border search exception permits a government officer at an international border to conduct a 'routine' search and seizure, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." U.S. v. Pickett, 598 F.3d 231, 234 (5th Cir. 2010) (quoting U.S. v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)); U.S. v. Ramsey, 431 U.S. 606, 620 (1977).   Under this border search exception, Riano did not violate Mireles's constitutional rights by searching her vehicle or purse as part of his duties.  It is also true that being forced to endure an especially lengthy detention – with nothing more – at the border does not implicate any Fourth Amendment rights. Tabbaa, 509 F.3d at 99-101.

The border search exception, however, does not give Riano carte blanche to conduct roving arrests without probable cause. See U.S. v. Guzman-Padilla, 573 F.3d 865, 882 (9th Cir. 2009) ("the government's success in demonstrating an entitlement to conduct a border search does not end our inquiry, since there remains the possibility that the incidental

16

detention or seizure amounted to an 'arrest' requiring probable cause."). Rather, the border search exception gives him the authority to conduct a "routine search" of someone entering the United States. U.S. v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998). A routine search is one that searches luggage, outer clothing, personal effects, purse, wallet and other similar property. U.S. v. Cardenas, 9 F.3d 1139, 1148 n. 3 (5th Cir. 1993). If Riano goes beyond a "routine search," then at a constitutional minimum, he is required to have "reasonable suspicion" that Mireles is engaging in wrongdoing. Id.

By tackling Mireles, handcuffing her and placing her in the backseat of a patrol car – with the rear doors closed – Riano clearly went beyond a routine search of Mireles's person and effects. It also went far beyond the inconveniences of a merely prolonged wait to allow a routine search to be completed.[9] Tabbaa, 509 F.3d at 99-101. Instead, by his actions, Riano transformed the encounter from a routine border search into an arrest.

Riano, citing U.S. v. Nava, 363 F.3d 942, 946 (9th Cir. 2004), argues that use of handcuffs by officers on the border is reasonable and that the use does not convert Mireles's detention into an arrest. Dkt. No. 73, p. 17. An examination of the facts in Nava, however, does not support Riano's argument in the instant case.

In Nava, the Ninth Circuit discussed a line of cases that permitted Border Patrol agents to briefly handcuff a suspect, while escorting them to a secondary waiting area, and, while conducting a brief patdown search, before removing the handcuffs. Id. at 944-946. The suspect was informed in advance that they were being handcuffed; the handcuffs were on for a brief period of time; and, the officers removed the handcuffs, after briefly ensuring that the person posed no danger to the officers. Id. The Ninth Circuit concluded that these actions did not turn a border detention into an arrest for Fourth Amendment purposes. This

---

[9] Riano has cited Castro v. Cabrera, 742 F.3d 595 (5th Cir. 2014) for the proposition that a lengthy detention at the border does not violate the Fourth Amendment. His reliance on this case is misplaced. In Castro, the plaintiffs were non-U.S. citizens who were denied entry into the United States; under the doctrine of "entry fiction," the Fourth Amendment did not apply to them. Id., at 599-601. There is no evidence in this case, in any fashion, showing that the doctrine of "entry fiction" would have applied to Mireles, a citizen of the United States..

conclusion seems reasonable.  What this holding does not do is to permit the tackling of an unthreatening individual, handcuffing that individual, and leaving that individual to sit in the back of a patrol vehicle while remaining handcuffed.  Nava avails Riano nothing in this case. In short, looking at the evidence in the current light, there is no reason for Riano to have believed that Mireles was engaged in any criminal activity.

Furthermore, Riano asserts that because the handcuffs malfunctioned, the force used against Mireles was negligently applied, and thus any delay cannot be attributed to Riano. This argument glosses too glibly over the facts.

It is beyond dispute that the handcuffs malfunctioned.  However, viewing the evidence in the light most favorable to Mireles shows that there is an issue of fact as to whether Mireles would have been free to leave if the handcuffs had not malfunctioned.  Riano's written statement to CBP officials does not indicate that the handcuffs were removed because Mireles was free to leave, but rather were removed only to allow paramedics to examine Mireles's injuries.  Indeed, Kishore testified that while Mireles was still in handcuffs, or even had a handcuff on a single wrist, Mireles was not free to leave. Dkt. No. 81, p. 355. Furthermore, Mireles's sister was present at the bridge, but was not allowed to interact with Mireles. Id., p. 356.  A reasonable person in these circumstances would not have believed that they were free to leave, even after the removal of the handcuffs.[10]

Any reasonable person would view what happened to Mireles – viewing the facts in the light most favorable to her – "to be a restraint on freedom of the kind that the law typically associates with a formal arrest." Freeman, 483 F.3d at 413.  Again, while the initial

---

[10] The Court again notes that whether Mireles was told she could leave as soon as the malfunctioning handcuff was removed is in dispute.  Compare Dkt. No. 81, p. 373 (Gutierrez stating that Kishore told Mireles that she would be free to leave as soon as the handcuff was removed) and Dkt. No. 81, p. 191 (Mireles testifying that Kishore did not approach her to inform her that she was free to leave until after the handcuff was actually removed).  For purposes of resolving the motion for summary judgment, the Court must view all of the evidence in the light most favorable to Mireles.  Accordingly, the Court will assume – for purposes of resolving this motion – that it was not until after the handcuffs were removed, that Kishore informed Mireles that she was free to leave.

detention to conduct the search was lawful, the other acts that followed the search amounted to an arrest for constitutional purposes.  That conclusion, however, is only half of the inquiry.

### b. Reasonableness

Having concluded that Riano arrested Mireles within the meaning of the Fourth Amendment, the Court must examine whether that arrest was reasonable.  Atwater v. City of Lago Vista, 195 F.3d 242, 244 (5th Cir. 1999) (en banc).  The reasonableness of Riano's decision to arrest Mireles depends upon whether probable cause existed for the arrest.  Wooley, 211 F.3d at 925.  "The appropriate balance between an individual's interest in remaining free from seizure of his person and the government's interest in enforcing its laws has been reached by requiring a warrant or the existence of probable cause that the individual has committed some criminal act." Id.

Probable cause is required for arrests made by border protection officers.  U.S. v. Alvarado-Garcia, 781 F.2d 422, 426 (5th Cir. 1986) (noting that if probable cause did not exist for an arrest, border patrol officers were compelled to release the suspect), overruled on other grounds, U.S. v. Bengivenga, 845 F.2d 593 (5th Cir. 1988).  "Though law enforcement officers protecting our border have more leeway than law enforcement officers in other settings with regard to searches and detentions, probable cause to suspect criminal activity is still generally required for arrest." U.S. v. Garcia-Rivas, 520 Fed. App'x. 507, 508 (9th Cir. 2013) (unpubl.).  The Fifth Circuit has consistently reviewed arrests by border protection and border patrol officers – conducting their duties at an international border or a checkpoint – for probable cause.  U.S. v. Rodriguez, 702 F.3d 206, 209 (5th Cir. 2012) (applying probable cause analysis to arrest made at border checkpoint); U.S. v. Marioni-Melendez, 460 Fed. App'x. 336, 339-340 (5th Cir. 2012) (unpubl.) (applying probable cause analysis to arrest made in proximity to border); U.S. v. Calderon-Beltran, 124 Fed. App'x. 223 (5th Cir. 2004) (unpubl.) (same); Bengivenga, 811 F.2d at 855 (applying probable cause analysis to arrest made at border checkpoint).

Probable cause is defined as "facts and circumstances within the officer's knowledge

that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (citations omitted).

The objective facts known to Riano at the time of the arrest do not reasonably support a finding of probable cause to arrest Mireles.  Riano knew that Mireles had taken a shortcut back to the duty free store; he also knew, based upon information from another officer,  that the route had been authorized by a law enforcement officer.  Dkt. No. 81, p. 242-43. Mireles did not have her purse with her, Id. at 148; Riano had control of Mireles's purse, he was searching it in the vehicle, Id. Accordingly, in that circumstance there was nothing in Mireles's purse that she could use against Riano.  Furthermore, Mireles informed Riano why she had moved – to watch him search her purse – and took no actions contrary to her stated purpose; in other words, she took no actions that would have made Riano suspect that her stated reason was pretextual.  Riano admitted that he did not remember seeing Mireles reach for anything when she stood by the door. Id, p. 248.  Finally, Riano also knew that there was no law or policy which prohibited Mireles from watching the search. Id., p. 245-46.

Under these objective facts, there was no probable cause to arrest Mireles for any crime.  While traffic stops may be "especially fraught with danger to police officers,"[11] there is no objective evidence that this particular stop was dangerous.  Riano has not identified any crime that Mireles may have committed or that she – in any way – presented a threat to him or others.

The only possible offense raised – and then only by stretching the facts – is resisting a law enforcement officer.  It is a violation of Federal law to resist federal law enforcement officers. 18 U.S.C. § 111(a).  Commission of that offense, however, requires the use of force by the person being arrested. U.S. v. Hazelwood, 2007 WL 1888883, *3 (W.D. Tex. 2007) (unpubl.) (citing U.S. v. Arrington, 309 F.3d 40, 44 (D.C. Cir. 2002)).  No facts have been alleged that Mireles used force against Riano, or that she was about to use such force.

---

[11] Michigan v. Long, 463 U.S. 1032, 1047 (1983).

Riano appears to assert that the need to handcuff Mireles was necessitated by officer safety concerns.  See Dkt. No. 85, p. 9 (describing Riano's actions as "preserving the safety of himself and others in the area by removing Plaintiff from the uncleared driver's side doorway.").  However, even viewed through that lens, the decision to arrest Mireles was unreasonable.  While "an officer may resort to physical restraint in special circumstances, doing so is 'not ordinarily proper' without probable cause." Brown v. Lynch, 524 Fed. App'x. 69 (5th Cir. 2013) (unpubl.) (quoting 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 9.2(d) (5th ed. 2012)).

In cases where a person is suspected of a non-violent crime and poses "a remote threat of either fight or flight," the Fifth Circuit has "never allowed the use of handcuffs on reasonable suspicion alone." Id.  As previously detailed, and under the light in which the Court must view the evidence, there are no objective facts to support any claim that Mireles posed a serious threat of either fight or flight.  The law permits Riano to react to ensure his safety; it does not permit him to over-react.  Officer safety cannot reasonably justify Mireles's arrest.

At this point – given the violation of Mireles's constitutional rights – the question becomes whether Riano is entitled to qualified immunity.  That question, in turn, rests upon whether the rights that were violated were clearly established at the time of the violation.  If the rights were clearly established, qualified immunity does not shield the agent.  On the other hand, if the rights were not clearly established, then qualified immunity applies and Mireles's claims must be dismissed.

### c. Qualified Immunity

As noted earlier, a two-part analysis is employed to resolve claims of qualified immunity: (1) whether the defendant violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the violation.  The Court has already concluded that Riano violated Mireles's constitutional rights.  Therefore, the Court turns to the second question, i.e. whether those rights were clearly established.

The right to be free from arrests that lack probable cause was clearly established at the time of the incident.  The incident occurred on November 5, 2012. Dkt. No. 81, p. 41.  It has long been the law in this country, that federal agents may not arrest a person without probable cause.  In fact, as far back as 1971 – in <u>Bivens</u> – the Supreme Court held that federal agents could be held civilly liable for arresting a man without probable cause. <u>Bivens</u>, 403 U.S. at 392-93.  This is not a new development or change in the law.

A reasonable officer would have known that handcuffing Mireles and making her sit in the back of a CBP vehicle – for what currently appears to be an hour or more – would constitute an arrest. <u>Freeman</u>, 483 F.3d at 413 (30-45 minute detention was a <u>de facto</u> arrest for Fourth Amendment purposes); <u>Zavala</u>, 541 F.3d at 580 (90 minute detention); <u>U.S. v. Place</u>, 462 U.S. 696, 709-10 (1983) (same).  In fact, it seems to be more the conditions of the detention than the mere fact that she was detained, that renders Mireles's detention an arrest.  Those conditions, coupled with the length, would have alerted a reasonable officer that Mireles's detention was an arrest.

That same reasonable officer also would have known that he needed probable cause to justify that arrest and that probable cause was lacking in this case. <u>Wooley</u>, 211 F.3d at 925.  None of these conclusions are new, novel, or otherwise unfamiliar to law enforcement officers in this country.  These concepts encompass basic constitutional rights. Thus, Mireles's constitutional rights were clearly established at the time of the incident.

Having found that Riano violated Mireles's clearly established constitutional rights, when he arrested Mireles without probable cause, it seems equally clear that Riano is not entitled to the protections of qualified immunity in effecting that arrest.  Accordingly, the motion for summary judgment, based upon qualified immunity, should be denied.

### B. Unreasonable Force Claim

Mireles also claims that Riano violated her constitutional rights when he used unreasonable force in effectuating her arrest.  Again, Riano has asserted qualified immunity as a defense to the claim.  After viewing the facts in the light most favorable to Mireles, the

Court concludes that Riano is not entitled to qualified immunity.

"To establish the use of excessive force in violation of the Constitution, a plaintiff must prove: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Elizondo v. Green, 671 F.3d 506, 510 (5th Cir. 2012) (quoting Collier v. Montgomery, 569 F.3d 214, 218 (5th Cir. 2009)).

Thus, the Court will consider whether Mireles has submitted evidence to show a genuine dispute of material fact as to the excessive and unreasonable nature of the force used and whether that force caused injury. The question then turns to the issue of qualified immunity, which – again – requires a determination of whether the law was clearly established at the time the excessive force was used.

### a. Excessive & Unreasonable Force[12]

In determining whether Riano's use of force was excessive and unreasonable, the Court is to be guided by "the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. The "reasonableness" of a particular use of force must be judged from the perspective of "a reasonable officer on the scene," rather than with the 20/20 vision of hindsight. Id.

Viewing the facts in the light most favorable to Mireles, the evidence shows that as Riano searched Mireles's purse on the passenger side of the vehicle, she moved closer to the driver's side of the vehicle; she moved within arm's reach of the drivers side door. When he told her to move back, she did not comply, but asked to watch him search her purse. Riano repeated his direction that she move back away from the car and Mireles repeated her

---

[12] The Fifth Circuit has noted that these inquiries "are often intertwined." Poole v. City of Shreveport, 691 F.3d 624, 628 (5th Cir. 2012). Thus, the Court will address these issues simultaneously rather that repeating its analysis. See Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (simultaneously analyzing excessive force and unreasonableness).

intention to watch the search of her purse.  At that point, Riano came around the vehicle, and – without any further verbal warnings or other directions – grabbed Mireles and forced her to the ground.

At the time that he took this action, Riano knew that Mireles had taken a shortcut back to the duty free store, but he also knew that route had been authorized by another federal agent.  Riano also knew that Mireles was considerably smaller than him and weighed less than half as much as he did.

In determining whether the amount of force used is reasonable, there is no precise definition of reasonableness.  As discussed above, the Court must consider: (1) the facts and circumstances of the encounter; (2) the severity of any crime the "suspect" is thought to have committed; (3) the immediate threat to the safety of the officer or others; and (4) whether the suspect is actively resisting arrest or attempting to flee.  Graham, 490 U.S. at 396. Employing the currently required factual standard, the facts indicate that the force used by Riano was excessive to the facts warranted or appropriate to this particular situation, by any standard.

First, the facts indicate that when directed to exit her vehicle and step away from her car, Mireles complied.  Indeed, even when she moved back towards her car – to observe the search of her purse – such an observation was not a prohibited act.  Thus, while perhaps insistent – that she be allowed to observe the search of her purse – no criminal activity was demonstrated by such insistence.  Simply making the officer more self-conscious about being observed, does not raise the observation to a criminal act.

Second, as to the severity of the crime at issue, the Court reiterates its prior analysis of the issues surrounding probable cause.  At the time that Riano forced Mireles to the ground, there was no reason to believe that she had committed any crime.  No contraband had been found in the search.  She was not actively resisting arrest, but was passively standing on the other side of the car, albeit in a place that Riano told her not to stand, watching the search of her purse – an act that she was not prohibited from doing.

24

Third, the issue of whether Mireles posed an immediate threat to the safety of the officers is the most contested element in this case. Riano has emphasized that he reasonably believed that Mireles – by repositioning herself so close to the vehicle and refusing verbal commands to move – posed an immediate threat to his safety. The Court notes that in analyzing this claim, it must view the facts in the light most favorable to Mireles and then determine if a reasonable officer in Riano's place would recognize that his conduct was objectively unreasonable. Ramirez v. Martinez, 716 F.3d 369, 378 (5th Cir. 2013). Under this test, Mireles did not pose an immediate threat to the safety of the officers.

It is undisputed that Riano ordered Mireles to return to the place where she had once stood and Mireles failed to do so. "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." Deville, 567 F.3d at 167. Officers, however, must assess "the relationship between the need and the amount of force used." Id. Moreover, in deciding the issue, the Court should consider whether the officers used "measured and ascending responses," in responding to a suspect's noncompliance. Poole, 691 F.3d at 629. "A suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test." Curran v. Aleshire, 800 F.3d 656, 661 (5th Cir. 2015).

There are several cases which are instructive on this point. In Deville, the plaintiff was pulled over for speeding and had her granddaughter in the car with her. When the officer told her that he clocked her going 10 miles over the speed limit, the plaintiff responded with an obscenity. The officer informed the plaintiff that she needed to exit the vehicle and that child services was coming to retrieve her granddaughter. The plaintiff refused to leave the vehicle until her husband arrived to take her granddaughter home. Deville, 567 F.3d at 161.

The chief of police arrived as backup and told the plaintiff that she "needed to get the window down or he was going to break it." Deville, 567 F.3d at 162. Before she could roll down the window, the chief of police broke the window with his flashlight; opened the door;

pulled her out of the vehicle; and, shoved her against the vehicle. Id.

The Fifth Circuit found that, based upon the plaintiff's version of events, the defendants were not entitled to qualified immunity. Deville, 567 F.3d at 169. The appeals court considered: (1) that the plaintiff was not attempting to flee; (2) that she was passively resisting by insisting on waiting until her husband arrived; and, (3) that she did not place anyone in danger with her actions. From these facts, the Fifth Circuit reasoned that the force – under the plaintiff's version of events – was excessive to the need. Because the chief of police "engaged in very little, if any negotiation" with the plaintiff before escalating the situation, the force used was excessive. Id.

In Newman v. Guedry, the Fifth Circuit also determined that the officers used excessive force. Newman, 703 F.3d 757 (5th Cir. 2012). In that case, the plaintiff was a passenger in a vehicle that was pulled over for speeding. Another occupant of the vehicle had outstanding warrants and began to resist arrest. The plaintiff got out of the vehicle to urge his friend to calm down. An officer did a pat down search of the plaintiff, who made an inappropriate comment when the officer patted down his groin area. The officer shoved him down onto the car and another officer hit him "thirteen times in nine seconds" with a nightstick and then tased him three times. Id., at 759-61.

The Fifth Circuit noted that if the plaintiff's version of events was true, "the officers immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands." Newman, 703 F.3d at 763. The Fifth Circuit stated that "the particular facts of this encounter did not justify treating [the plaintiff] as a serious threat." Id., at 762-63. Accordingly, the Fifth Circuit affirmed the denial of qualified immunity.

In Ramirez v. Martinez, a sheriff's deputy went to the plaintiff's business to serve an arrest warrant on one of the plaintiff's relatives. Ramirez, 716 F.3d 369, 372-73. The plaintiff discovered that officers "had their guns drawn and were pointing the guns at his employees, who were kneeling down." Id. The plaintiff asked the defendant "what was

happening and why the officers were there" and the two "exchanged profanities." <u>Id</u>.  The defendant shouted at the plaintiff, "You shut your mouth or I will take you to jail," to which the plaintiff replied, "This is my business, OK?" <u>Id</u>.  The defendant demanded that the plaintiff turn around and place his arms behind his back. <u>Id</u>.  When the plaintiff failed to comply, the defendant grabbed his hand and told him to turn around, but the plaintiff pulled his arm away. <u>Id</u>.  The defendant "immediately tased [the plaintiff] in the chest." <u>Id</u>.

The Fifth Circuit held that the defendant was not entitled to qualified immunity, finding that "a reasonable officer could not have concluded [the plaintiff] posed an immediate threat to the safety of the officers by questioning their presence at his place of business." <u>Id.</u>, at 378.  It also held that the pulling away of the arm "without more is insufficient to find an immediate threat to the safety of the officers." <u>Id</u>.

A sampling of the cases in which it was determined that the force employed was not excessive are equally instructive.  In each case, the plaintiff attempted to flee, or was physically combative, or posed a direct threats to the officers. <u>See</u> <u>Salazar-Limon v. City of Houston</u>, No. 15-20237, 2016 WL 3348794, at *2 (5th Cir. June 15, 2016), as revised (June 16, 2016) (suspect reached toward his waistband, leading officer to believe that he possessed a weapon); <u>Mendez v. Poitevent</u>, 823 F.3d 326, 332 (5th Cir. 2016) (suspect physically struggled with officer, attempted to grab officer's gun); <u>Small ex rel. R.G. v. City of Alexandria</u>, 622 F. App'x 378, 380 (5th Cir. 2015) (suspect told officer "you got your weapon, I got mine too" and reached under mattress); <u>Royal v. Spragins</u>, 575 F. App'x 300, 301 (5th Cir. 2014) (suicidal suspect pointed rifle at officers); <u>Downey v. Barry</u>, 517 F. App'x 247, 248 (5th Cir. 2013) (unpubl.) (suspect fled officer and appeared to be reaching in waistband for a weapon);  <u>McCoy v. Lowndes Cty., Miss.</u>, 380 F. App'x 447, 448 (5th Cir. 2010) (unpubl.) (suspect was holding a nail gun, refused to put it down and physically assaulted several officers); <u>Williams v. City of Cleveland, Miss.</u>, 736 F.3d 684, 688 (5th Cir. 2013) (suspect was non-compliant and physically struggled with officers); <u>Elizondo v. Green</u>, 671 F.3d 506, 510 (5th Cir. 2012) (suspect was holding a knife and continued to advance on

27

officers, despite being instructed to stop); <u>Ramirez v. Knoulton</u>, 542 F.3d 124, 131 (5th Cir. 2008) (suspect was holding a handgun, was emotionally unstable, and potentially suicidal); <u>Young v. City of Killeen, Tex.</u>, 775 F.2d 1349, 1353 (5th Cir. 1985) (suspect was reaching under seat of car and officer believed that suspect was reaching for a weapon).

The use of force – even deadly force – is reasonable "when an officer would have reason to believe the suspect poses a serious threat of harm to the officer or others." <u>Mercer</u>, 2014 WL 3882460, *2 (5th Cir. 2014) (internal citation omitted) (quoting <u>Mace v. City of Palestine</u>, 333 F.3d 621, 624 (5th Cir. 2003)).  In <u>Mercer</u>, the Fifth Circuit concluded that firing an assault rifle directly into the truck was not unreasonable when the driver was leading the police on a high-speed chase that at times exceeded 100 miles per hour on a busy interstate.  <u>Id</u>.  In judging whether an officer's actions were reasonable, the Court must "<u>consider the risk of bodily harm that [the officer's] actions posed to [the plaintiff] in light of the threat that [the officer] was trying to eliminate</u> . . .".  <u>Id</u>. at *3 (emphasis supplied by the Fifth Circuit) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 383-84 (2007)).  None of these considerations are present in the instant case.  As currently postured, neither the justification for the amount of force, nor the purported threat that the force was needed to address, are evident.

In cases where the suspect was non-compliant and force was used, the Court looks to whether the officers used "measured and ascending force . . . that corresponded to [the suspect's] escalating verbal and physical resistance." <u>Poole</u>, 691 F.3d at 629.  In <u>Poole</u>, the suspect did not "give up his right arm" to allow himself to be handcuffed and later kicked and screamed at the officers.  <u>Id</u>.  In response, the officers issued verbal commands and tried grabbing his arm, before finally applying and withdrawing a taser "very quickly." <u>Id</u>.  The Fifth Circuit focused on the fact that the ascending use of force corresponded with the suspect's increasing resistance and found that the force used was not excessive. <u>Id</u>.

Riano has cited this language in <u>Poole</u> in support of his claim that the force he used was not excessive. Dkt. No. 85, p. 2.  Riano claims that Mireles "actively resist[ed]" him and

his use of force corresponded to that resistance. Id. This claim is not supported by the facts, as they must be viewed in the current posture before the Court.

In this case, Riano's actions were not measured in response to Mireles's essentially static resistance. Mireles re-positioned herself to better watch Riano search her purse and clearly informed Riano as to why she had repositioned herself. Her movements were not furtive. Thus, despite arguments to the contrary, the facts indicate that Mireles did not pose an immediate threat to anyone.

Riano has attempted to justify the force used by noting that it was dark outside and that he could not clearly see Mireles's movements, which amplified the threat. Dkt. No. 73, p. 38 (Riano stating that "the area where the incident happened was not lighted."). The visibility that was available to Riano is a disputed issue in this case. See Dkt. No. 81, p. 220 (Diaz noting that the store lights were on and there was "some light[] available"); p. 143 (Mireles noting that her dome light was on). As previously noted, the Court must view the facts in the light most favorable to Mireles; accordingly, the Court must accept that there was some light available to Riano for purposes of this motion.

Riano further attempts to justify his use of force by asserting that he "was conducting an inherently dangerous search of her purse and vehicle at the time this incident occurred." Dkt. No. 85, p. 3. Riano cites several cases for the proposition that weapons can be concealed in vehicles and purses. Id. The Court does not disagree. If Mireles had possessed her purse when this incident occurred, the situation would have been objectively more dangerous. However, Riano possessed Mireles's purse during the search; if Mireles had a weapon in the purse, then Riano was in possession of the weapon, not Mireles. Furthermore, Riano had already searched the area near the drivers' side door where Mireles was standing; if she possessed any weapons in the vehicle, presumably they would have been found during that portion of the search. Riano cannot cite any dangers posed by the purse to justify his use of force.

Moreover, to whatever extent Mireles may have posed a threat to Riano, the force

used was clearly excessive in relation to that threat.  In response to a suspect moving a few steps to get a better view of the search, Riano tackled the suspect – who was half his size – to the ground, placed his weight upon her, and handcuffed her.  Unlike the officers in Poole, Riano did not use "measured and ascending" force in order to ensure compliance. Poole, 691 F.3d at 629.

Riano cites Fils v. City of Aventura, 647 F.3d 1272, 1290-91 (11th Cir. 2011), for the proposition that an officer may tackle a non-compliant subject.  The facts in Fils are clearly distinguishable from the present case.  In Fils, the plaintiff was told not to move and began screaming and moving toward an officer who had his back to her – and would have been unable to protect himself from an attack.  Another officer threw the plaintiff to the ground to prevent her from attacking his fellow officer.  Thus, there was objective evidence that the plaintiff posed an immediate threat of harm to an officer and the force used was reasonably used to neutralize that harm.  There are no analogous facts in this case showing that Mireles posed a similar threat of harm.

The Court is not saying that Riano was unjustified in asking Mireles to move in order to ensure officer safety.  The issue is whether Riano was reasonable in using overwhelming physical force to take Mireles to the ground, place his knee in her back and handcuff her because she did not comply with his verbal order.  Moreover, these acts were in response to Mireles's insistence that she be allowed to do something that Riano has admitted that Mireles was not prohibited from doing – watching Riano search Mireles's purse. Dkt. No. 81, p. 245-46.

As to the fourth consideration – whether the suspect posed a flight risk – there is no evidence that Mireles was a flight risk.  Indeed, the force was used because she was not moving rather than because she was fleeing.

The Court fully appreciates that, when determining whether an officer's decisions were reasonable, it must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.  But even under this deferential standard, officers are not afforded a license to use force when the objective facts known to the officer do not justify the use of force.  Officers are permitted to be mistaken, but they cannot act unreasonably. Id.

Simply stated, under the facts presented in the current light, a reasonable officer would not be justified in escalating the use of force so quickly in response to Mireles's actions.  For that reason, the force used by Riano appears unreasonable and excessive, and violated Mireles's constitutional rights.

### b. Injury

The questions of injury and whether excessive force was used are often inseparable. A plaintiff must plead more than de minimis injuries.  However, if the force used was not excessive, then any injuries suffered – no matter how medically severe – will be considered de minimis. Brown v. Lynch, 524 Fed. App'x. 69, 79 (5th Cir. 2013) (unpubl.).  On the other hand, if the force used is constitutionally excessive, then even "relatively insignificant injuries" suffice to meet the injury requirement. Id. (collecting cases).

The Fifth Circuit has held that "pain, soreness and bruising" is sufficient to support a claim of excessive force if that force is unreasonably applied. Schmidt v. Gray, 399 Fed. App'x. 925, 928 (5th Cir. 2010) (unpubl.) (concluding that a plaintiff who alleged that a police officer slammed the trunk lid on his finger for no apparent reason stated a sufficient injury for Fourth Amendment purposes).  The injuries in this case are at least as serious – if not more serious – than the injuries pled in Schmidt.

Mireles has submitted photos of her injuries into evidence, showing various injuries to her left wrist, her right forearm, her knees, her left elbow and her right foot, among others. Dkt. No. 81, pp. 52-68.  The injuries in this case – "combined and in context" – raise a genuine dispute of material fact as to whether Mireles suffered sufficient injury for Fourth Amendment purposes. Schmidt, 399 Fed. App'x. at 928.

### c. Qualified Immunity

Having concluded that Mireles has – for current purposes – sufficiently alleged a constitutional violation by Riano's use of excessive force, the Court must determine whether these rights were clearly established at the time of the incident.  As noted earlier,  "[a] right is clearly established if it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Davila, 713 F.3d at 257 (citing Saucier v. Katz, 533 U.S. 194, 202 (2001)).

In Graham v. Connor, the Supreme Court concluded that citizens have a right to be free from excessive force and that the use of force is to be analyzed under a standard of objective reasonableness. Graham, 490 U.S. 386 (1989).  Thus, the prevailing case law and the applicable standard had been in effect for over 20 years at the time of the incident.

It was also clearly established that the amount of force permitted is based upon the need to use such force. Deville, 567 F.3d at 167.  This is not a theoretical consideration, but a practical application of restraint that is intended to prevent over-reaction in non-threatening situations. Id.  A reasonable officer would have known that the amount of force he could reasonably use was inextricably linked to the danger presented. City of Palestine, 333 F.3d at 624; Scott, 550 U.S. at 383-84.  In this case, Mireles posed no immediate danger to Riano and his use of force was unwarranted.  This is not mere hindsight; the objective facts, known to Riano at the time that he acted, did not support the level of force he employed.

As discussed earlier, when judging claims involving noncompliant subjects, the Fifth Circuit has made it clear that officers should use "measured and ascending" responses in order to ensure compliance under the specific facts of the case at hand. Poole, 691 F.3d at 629.  Faced with a non-compliant suspect who – under the objective facts known to the officer – does not pose a risk of fight or flight, an officer should not immediately resort to the highest levels of force. Deville, 567 F.3d at 168.  However, if a non-compliant suspect continues to struggle; does not submit to the officers' commands; and the officers use measured responses to the non-compliance, then an officer may justifiably use increased force to ensure compliance. Poole, 691 F.3d at 629.  While the ultimate conclusions in Poole

and <u>Deville</u> differ – in the former, the force was not excessive, while in the latter, the force was found to be excessive – the standard used to judge the officers' conduct was consistent. The Fifth Circuit's holdings in <u>Poole</u> and <u>Deville</u> are neither contradictory, nor muddled. <u>See</u> <u>Poole</u>, 691 F.3d at 629-630, n 4 (noting that the facts underlying <u>Poole</u> and <u>Deville</u> were "distinguishable.").

There can be no reasonable confusion that the force employed in this case, under the facts as submitted, was excessive and that using that excessive force injured Mireles. Moreover, the excessive nature of that force – vis-a-vis the threat presented – would have been recognized by any reasonable law enforcement officer.  In short, Mireles has raised genuine disputes of material fact that overcome any claim of qualified immunity at this stage. For that reason, Riano is not entitled to the protections of qualified immunity at this time[13] and his motion for summary judgment should be denied.

## IV. Recommendation

It is **RECOMMENDED** that the motion for summary judgment filed by Daniel Riano, Dkt. No. 73, should be denied.

### A. Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. §  636(b)(1). Failure to timely file objections shall bar the parties from a <u>de</u> <u>novo</u> determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. <u>See</u> § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Douglass</u>

---

[13] The Court notes that if this case goes to trial and "there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question." <u>Presley v. City of Benbrook</u>, 4 F.3d 405, 410 (5th Cir. 1993).  This report and recommendation is not be read as deciding whether such jury instructions would be appropriate; that is an issue to be decided at a later time, if necessary.

v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

      DONE at Brownsville, Texas, on July 29, 2016.

                                                           _____

                                                      Ronald G. Morgan
                                                      United States Magistrate Judge